**EXHIBIT B TO EXHIBIT 1 TO NOTICE OF REMOVAL**

DEC - 2 2002

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is entered into this ____ day of _____, 2002, to be effective as of _____, 2002 (the "Effective Date"), by and between Creed Electrical Supply and Equipment Corporation, a New York corporation (the "Company"), and Ron Padovani, an individual resident of the State of New Jersey ("Employee").

### WITNESSETH:

WHEREAS, Employee was previously employed by the Company, and subsequently left such employment;

WHEREAS, Employee now wishes to once again be employed by the Company, and the Company wishes to employ Employee, all on the terms set forth in this Agreement;

NOW THEREFORE, in consideration of the mutual premises, covenants and agreements contained herein, the parties hereto agree as follows:

1.  Definitions. For purposes of this Agreement, the following capitalized terms shall have the definition as set forth below:

    (a)  "Board of Directors" means the Board of Directors of the Company.

    (b)  "Cause" means:

        (i)    commission by Employee of a felony;

        (ii)   Employee's use of alcohol or drugs to an extent that materially interferes with Employee's performance of his duties of employment;

        (iii)  Employee's engaging in fraud, misappropriation, embezzlement, or similar acts involving moral turpitude or bad faith on the part of Employee;

        (iv)   Employee's insubordination, commission of an act of dishonesty, or engagement in willful misconduct, deceit or civil rights violation or other unlawful act;

        (v)    Employee's disregarding of policy directives from the Company's President, Chairman of the Board of Directors or Board of Directors;

        (vi)   Employee's violation of any fiduciary obligation to the Company;

        (vii)  Employee's violation of any provision of the policies, work rules, procedures or standards of the Company;

        (viii) Employee's failure to perform his duties under this Agreement; or

ATLANTA:4481997.4

(ix) Employee's violation of any covenant or obligation under this Agreement or any other agreement with the Company.

(c) "Disability" means a physical or mental impairment that substantially limits, with or without reasonable accommodation, one or more of the major life activities of Employee, and shall be determined in accordance with 29 CFR 1630.2 and 1630.3 and any other regulations promulgated under the Americans with Disabilities Act.

2. Employment, Duties and Term.

(a) Subject to the terms hereof, the Company hereby employs Employee as an Outside Salesperson, and Employee accepts such employment with the Company on the terms of this Agreement. In such capacity, Employee shall perform the duties appropriate to such office or position, and such other duties and responsibilities as are assigned to him from time to time by the President or Chairman of the Board of Directors.

(b) Employee agrees that, during the Term (as defined below), he shall devote substantially all of his business time, attention, and energies to the business and affairs of the Company, shall act at all times in the best interests of the Company, and shall not during the Term be engaged in any other business activity, whether or not such business is pursued for gain, profit, or other pecuniary advantage, or permit such personal interests as he may have to interfere with the performance of his duties hereunder; provided, however, Employee may participate in industry, civic and charitable activities so long as such activities do not materially interfere with the performance of his duties hereunder. Further, Employee shall conduct himself at all times in a businesslike and professional manner as appropriate for a person in his position and shall represent the Company in all respects as complies with good business and ethical practices, and shall be subject to and abide by the good faith policies and procedures of the Company applicable generally to personnel of the Company, as adopted from time to time.

3. Term. Unless earlier terminated as provided herein, the term of this Agreement shall be for an initial term commencing on the Effective Date and ending on the first yearly anniversary of the Effective Date (the "Initial Term"); upon the expiration of such Initial Term, the term of this Agreement shall automatically renew for successive one-year periods (each a "Renewal Term") unless either party provides notice to the other of its intent not to renew this Agreement no less than ninety (90) days prior to the scheduled expiration of the Initial Term or the current Renewal Term, as applicable. The date on which this Agreement expires or is terminated (regardless of the reason for such termination or the identity of the party that elects to terminate) is herein called the "Termination Date," and the period from the Effective Date until the Termination Date is herein called the "Term."

4. Commission. In consideration of the Employee's services rendered hereunder, and subject to the terms and conditions hereof, the Company shall pay Employee compensation in the form of a sales commission as set forth on Exhibit A. Amounts paid to Employee pursuant to this Section 4 are herein referred to as "Commission."

5. <u>Termination</u>.

    (a) This Agreement may be terminated during the Term as follows:

    (i) by the mutual agreement of the Company and Employee;

    (ii) by the Company, for Cause, immediately upon notice to Employee;

    (iii) by the Company upon the death or Disability of Employee;

    (iv) by the Company, without Cause, immediately upon written notice to Employee; or

    (v) by Employee, upon 30 days prior written notice to the Company.

    (b) Upon termination or expiration of this Agreement, the Company shall pay to Employee all Commission due as provided in <u>Exhibit A</u>, and thereafter, all such payments shall cease; <u>provided, however</u>, in case of a termination pursuant to Section 5(a)(iv), the Company shall pay to Employee an amount calculated as set forth on, and paid according to the schedule set forth in, <u>Schedule 5(b)</u> attached hereto (the "Separation Payment"). If this Agreement expires or is terminated other than pursuant to Section 5(a)(iv), the Company shall have no obligation to pay Employee any form of Separation Payment or other type of severance payment.

6. <u>Vacation</u>. Employee will be entitled to paid vacation in accordance with the Company's standard vacation policy promulgated from time to time; <u>provided, however</u>, that:

    (a) The term of Employee's prior employment with the Company (which the parties acknowledge and agree for this purpose shall be counted as [five years and seven months]) will be credited to Employee as of the Effective Date for purposes of determining vacation time; and

    (b) except as otherwise provided by applicable law: (i) the Company shall not pay Employee any additional compensation for any vacation time which is not used prior to the end of a calendar year or any earlier termination of employment, and (ii) any vacation time which is not used prior to the end of a calendar year may not be used in any subsequent year.

7. <u>Benefits</u>. Employee shall be entitled to participate in any employee benefit plans generally provided by the Company to its full-time employees, but only to the extent provided for in such employee benefit plans and for so long as the Company provides or offers such benefit plans. Attached as <u>Exhibit B</u> is a list of the benefit plans and other benefits that the Company presently anticipates providing to Employee; however, nothing stated herein shall prohibit the Company from modifying, amending or terminating such benefit plans, without prior notice.

8. <u>Expenses</u>. Employee shall be entitled to be reimbursed on a monthly basis in accordance with the policies of the Company, as adopted from time to time, for all reasonable and necessary expenses incurred by Employee in connection with the performance of Employee's duties of employment hereunder. Without limiting the foregoing:

(a) the Company's obligation to reimburse Employee for any expense is subject to the Employee's submission of receipts and other documentation required by the Company, including a sales call report, detailing which Customers have been called on by Employee, for the most recent month;

(b) any specific expense over $250, as well as holiday gifts, must be approved by the Company prior to being incurred in order to be reimbursable;

(c) the Company will reimburse Employee for automobile-related expenses (such as depreciation, maintenance, and insurance) up to a maximum of $400 per month; <u>provided</u>, that such $400 maximum shall not apply to gasoline expense; and

(d) unless specifically agreed by the Company, the maximum amount of all expenses, including those specifically discussed in Sections 8(a) through 8(c), for which Employee may be reimbursed in respect of any one month shall not exceed the lesser of (i) $1,000 or (ii) three percent (3%) of the Gross Profit (as defined herein) earned by Employee in respect of such calendar month.

9. <u>Confidential Relationship and Protection of Trade Secrets and Confidential Information</u>. In the course of Employee's employment with the Company, Employee has had access to and will have access to the Company's most sensitive and most valuable trade secrets, proprietary information, and confidential information concerning the Company and its subsidiaries, their present and future business plans, development projects, customers and business affairs which constitute valuable business assets of the Company, the use, application or disclosure of any of which will cause substantial and possible irreparable damage to the business and asset value of the Company. Accordingly, Employee accepts and agrees to be bound by the following provisions:

(a) For the purposes of this Agreement, the following definitions apply:

(i). "<u>Trade Secret</u>" means information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (A) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Trade Secrets also includes any information or data described above which the Company obtains from another party and which the

-4-

Company treats as proprietary or designates as trade secrets, whether or not owned or developed by the Company.

(ii) "Confidential Information" means any data or information, other than Trade Secrets, that is valuable to the Company and is not generally known by the public. To the extent consistent with the foregoing, Confidential Information includes, but is not limited to, lists (whether or not in writing) of the Company's current or potential customers, lists of and other information about the Company's executives and employees, financial information (whether or not in writing) that has not been released to the public by the Company, marketing techniques, price lists, pricing policies, and the Company's business methods, contracts and contractual relations with the Company's customers and supplier and future business plans. Confidential Information also includes any information or data described above which the Company obtains from another party and which the Company treats as proprietary or designates as confidential information whether or not owned or developed by the Company.

(b) At any time, upon the request of the Company and in any event upon the termination of employment, Employee will deliver to the Company all memoranda, notes, records, drawings, manuals, files or other documents, and all copies of each, concerning or constituting Confidential Information or Trade Secrets and any other property or files belonging to the Company or any of its subsidiaries that are in the possession of Employee, whether made or compiled by Employee or furnished to or acquired by Employee from the Company.

(c) In order to protect the Company's Trade Secrets and Confidential Information, Employee agrees that:

(i) Employee shall hold in confidence the Trade Secrets of the Company. Except in the performance of services for the Company, Employee shall not at any time use, disclose, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer the Trade Secrets of the Company or any portion thereof.

(ii) Employee shall hold in confidence the Confidential Information of the Company. Except in the performance of services for the Company, Employee shall not at any time during the term of this Agreement and for a period of five (5) years thereafter, disclose, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer the Confidential Information of the Company or any portion thereof.

10. Restrictive Covenants.

(a) Nonsolicitation of Customers. Employee agrees that, during the Term and for a period of two (2) years after the Termination Date, without the prior written consent of the Company, Employee will not, either directly or indirectly, on his own behalf or in

-5-

ATLANTA:4481997.4

the service of or on behalf of others, solicit, contact, call upon, communicate with or attempt to communicate with any customer or prospective customer of the Company, or any representative of any customer or prospective customer of the Company, with a view to sale or providing of any product, equipment, deliverable or service competitive or potentially competitive with any product, equipment, deliverable or service sold or provided or under development by the Company during the period of two (2) years immediately preceding the Termination Date; provided; however, that the restrictions set forth in this Section 10(a) shall apply only to those customers or prospective customers of the Company with whom Employee had contact during such two (2) year period. The actions prohibited by this Section 10(a) shall not be engaged in by Employee directly or indirectly, whether as manager, salesperson, agent, technical support technician, sales or service representative, or otherwise.

(b) <u>Nonrecruitment</u>. Employee agrees that, for a period of one (1) year after the Termination Date, without the prior written consent of the Company, Employee will not, either directly or indirectly, on his own behalf or in the service of or on behalf of others, solicit or attempt to solicit any person employed by the Company, whether or not such person is a full-time or a temporary employee of the Company and whether or not such employment is pursuant to a written agreement or independent contractor agreement and whether or not such employment is for a determined period or is at will.

(c) <u>Non-Disparagement</u>. Employee agrees that during the Term and after the Termination Date, without the prior written consent of the Company, Employee will not, either directly or indirectly, on his own behalf or in the service of or on behalf of others, either orally or in writing, take any action which does or could reasonably be interpreted to disparage or criticize the Company (including its management or shareholders or its practices or which disrupts or impairs its normal operations), and Employee agrees not to voluntarily provide assistance or information to any person or entity pursuing any claim, charge, or complaint against the Company or to any other person adverse to the Company, except that nothing in this Agreement shall be interpreted to limit either party's right to confer with counsel or to provide truthful testimony pursuant to subpoena or notice of deposition or as otherwise required by law.

(d) <u>Reasonability</u>. Employee acknowledges and agrees that the covenants contained in this Section 10 (collectively, the "Restrictive Covenants") are reasonable and necessary to the Company, and are valid in all respects. Further, if any Restrictive Covenants, or portion thereof, are declared to be invalid or unenforceable, Employee shall, as soon as possible, execute a supplemental agreement with the Company granting to the Company, to the extent legally permissible, the protection intended to be afforded to the Company by the Restrictive Covenants, or portion thereof, so declared invalid or unenforceable.

(e) <u>Tolling</u>. Employee agrees that in the event the enforceability of any of the terms of this Section 10 shall be challenged in court and Employee is not enjoined from breaching the Restrictive Covenants set forth in this Section 10, then if a court of competent jurisdiction finds that the challenged covenants are enforceable, the time

period restrictions specified in this Section 10 shall be deemed tolled upon the filing of the lawsuit involving the enforceability of this Section 10 until the dispute is finally resolved and all periods of appeal have expired.

(f) <u>Indemnification</u>. Employee shall indemnify the Company from and against any and all actions, suits, proceedings, liabilities, damages, losses, costs and expenses (including attorneys' and experts' fees) arising out of or in connection with any breach or threatened breach by Employee of any one or more provisions of this Agreement. The existence of any claim, demand, action or cause of action of Employee against the Company, shall not constitute a defense to the enforcement by the Company of any of the covenants or agreements herein.

11. <u>Work Product</u>. All Work Product (as defined below) shall be the exclusive property of the Company. If any of the Work Product may not, by operation of law or otherwise, be considered the exclusive property of the Company, or if ownership of all right, title, and interest to the legal rights therein shall not otherwise vest exclusively in the Company, Employee hereby assigns to the Company, and upon the future creation thereof automatically assigns to the Company, without further consideration, the ownership of all Work Product. The Company shall have the right to obtain and hold in its own name copyrights, patents, registrations, and any other protection available in the Work Product. Employee will promptly disclose any and all such Work Product to the Company. Employee agrees to perform, during or after termination of Employee's employment by the Company, and without requiring the Company to provide any further consideration therefor, such further acts as may be necessary or desirable to transfer, perfect and defend the Company's ownership of the Work Product as requested by the Company.

For purposes of this Agreement, "Work Product" shall mean all discoveries, designs, Trade Secrets, Confidential Information, trademarks, data, materials, formulas, research, documentation, computer programs, communication systems, audio systems, system designs, inventions (whether or not patentable), copyrightable subject matter, works of authorship, and other proprietary information or work product (including all worldwide rights therein under patent, copyright, trademark, trade secret, confidential information, moral rights and other property rights), which Employee has made or conceived, or may make or conceive, either solely or jointly with others, while providing services to the Company or with the use of the time, material or facilities of the Company or relating to any of Company's actual or anticipated business known to Employee while employed at the Company, or suggested by or resulting from any task assigned to Employee or work performed by Employee for or on behalf of the Company.

12. <u>Specific Enforcement</u>. The Company and Employee agree that a violation of Sections 9, 10, or 11 of this Agreement will cause irreparable injury to the Company and its affiliates and that, accordingly, the Company will be entitled, in addition to any other rights and remedies it may have at law or in equity, to seek an injunction enjoining and restraining Employee from doing or planning to do any such act and any other violation or threatened violation of Sections 9, 10, or 11.

13. <u>No Conflicting Obligations</u>. Employee represents and warrants to the Company that, as of the date this Agreement is executed and as of the Effective Date, he is not under any obligation of a contractual or other nature to any person or entity which is inconsistent or in conflict with this Agreement, or which would prevent, limit or impair in any way the performance by him of his obligations hereunder.

14. <u>Governing Law and Forum Selection</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Any action in law or equity regarding this Agreement or the Company's or Employee's rights hereunder may only be brought by either party hereto in the appropriate court in Westchester County, New York; the parties hereby waive any objection to personal jurisdiction in any proceeding before such court. The provisions of this Agreement do not in any way limit or abridge any rights of the Company or any of its subsidiaries or other affiliates under the law of unfair competition, trade secret, copyright, patent, trademark or any other applicable law(s), all of which are in addition to and cumulative of the Company's rights under this Agreement.

15. <u>Severability</u>. Each of the provisions of this Agreement shall be deemed separate and severable each from the other. In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason by final judgment of a court of competent jurisdiction, the remaining provisions or portions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law.

16. <u>No Set Off</u>. The existence of any claim, demand, action or cause of action of Employee against the Company, whether or not based upon this Agreement, will not constitute a defense to the enforcement by the Company of any covenant or agreement of Employee contained herein.

17. <u>No Attachment</u>. Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge or hypothecation, or to execution, attachment, levy or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect; provided, however, that this provision shall not prevent Employee from designating one or more beneficiaries to receive any amount after his death and shall not preclude his executor or administrator from assigning any right hereunder to the person or persons entitled thereto, and in the event of Employee's death or a judicial determination of Employee's incompetence. Employee's rights under this Agreement shall survive and shall inure to the benefit of Employee's heirs, beneficiaries and legal representatives.

18. <u>Source of Payments</u>. All payments provided under this Agreement shall be paid in cash from the general funds of the Company, and no special or separate fund shall be established and no other segregation of assets shall be made to assure payment.

19. <u>Tax Withholding</u>. The Company may withhold from any benefits payable under this Agreement all federal, state, city or other taxes as shall be required pursuant to any law or governmental regulation or ruling.

ATLANTA:4481997.4

20. <u>Notices</u>.  Any notice or communication between the Company and Employee with respect to this Agreement or events covered thereby shall be performed or confirmed in writing and be deemed given when delivered in person, or dispatched by registered or certified mail, return receipt requested, postage prepaid or by any overnight delivery service, as follows:

(i)  If to the Company:    Creed Electrical Supply and
                           Equipment Corporation
                           2 John E. Walsh Blvd.
                           Peekskill, New York 10566

     with a copy to:       McKenna Long & Aldridge LLP
                           303 Peachtree Street, Suite 5300
                           Atlanta, Georgia 30308
                           Attention: David M. Ivey

(ii) If to Employee:       Ron Padovani
                           25 Erie Avenue
                           Midland Park, New Jersey  07432

or at such other address as either party may have furnished to the other in accordance herewith, except that notices of change of address shall be effective only upon receipt.

21. <u>Amendment and Waiver</u>.  No provision of this Agreement may be amended or modified, unless such amendment or modification is in writing and signed by the Company and by Employee.  No waiver by either party hereto of any breach by the other party hereto of any condition or any provisions of this Agreement to be performed by such other party shall be deemed a waiver of a subsequent breach of such condition or provision or waiver of a similar or dissimilar condition or provision at the same time or any subsequent time.

22. <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of the Company's successors in interest, including, without limitation, successors through merger, consolidation, or sale of substantially all of the Company's stock or assets, and shall be binding upon Employee.

23. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will constitute an original but all of which together will constitute but a single document.

24. <u>Prior Agreements</u>.  This Agreement supersedes all previous agreements between the Company and Employee concerning terms and conditions of the employment of Employee by the Company, and all such previous agreements are hereby deemed canceled, terminated, and of no further force or effect.

25. <u>Entire Agreement</u>.  This Agreement, including all Schedules and Exhibits attached hereto, contains the entire agreement between the parties relating to Employee's

employment with the Company, and no statements, representations, promises or inducements made by any party hereto, or agreement of either party, which is not contained in this Agreement (or in a writing signed by both parties and expressly providing that it is supplemental to this Agreement) shall be valid or binding.

*(signatures appear on next page)*

IN WITNESS WHEREOF, Employee has hereunder set his hand and seal, and the Company has caused this Agreement to be executed by its duly authorized officer as of the day and year first above written.

"EMPLOYEE":

By: _____
      Ron Padovani

"COMPANY":

Creed Electrical Supply and Equipment Corporation

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, Employee has hereunder set his hand and seal, and the Company has caused this Agreement to be executed by its duly authorized officer as of the day and year first above written.

"EMPLOYEE":

By:_____
    Ron Padovani

"COMPANY":

Creed Electrical Supply and Equipment Corporation

By: _[signature]_
Name: STEVEN EMANUEL
Title: Pres.

-11-

ATLANTA:4481997.4

## Exhibit A

### Commission

(a)  Each week (or, in the event the Company converts its standard payroll processing to another period, such period) (in either instance, the "Payroll Period"), the Company shall advance to Employee an amount that is determined in good faith by the Company (the "Advance"), and which is intended to approximate the Commission likely to be earned by Employee during such Payroll Period. The amount of Employee's Advance as of the Effective Date will be $1500.00 per week. The amount of future Advances may be decreased by the Company upon two weeks' written notice to Employee.

(b)  Within fifteen (15) days after the end of each calendar month (beginning with the fourth month of the Term), the Company shall perform the following computation:

   (i)  the Company shall first compute the Commission earned by Employee in respect of the immediately preceding four-month period (the "Measurement Period") calculated as set forth in paragraphs (c) and (d), below. Such amount is referred to as the "Period Commission."

   (ii)  the Company shall then compute the amount of unreimbursed expenses of Employee for which Employee may properly be reimbursed, according to Section 8 of this Agreement. Such amount is referred to as the "Reimbursable Expenses."

   (iii)  the Company shall then compare the sum of the Period Commission and the Reimbursable Expenses to the total amount of Advances that have been made to Employee to date which have not been repaid or reconciled against Commission actually earned by Employee (the "Outstanding Advances").

      (A)  If the sum of the Period Commission and the Reimbursable Expenses exceeds the amount of the Outstanding Advances, the Company shall pay to Employee the excess.

      (B)  If the sum of the Period Commission and the Reimbursable Expenses is less than the amount of the Outstanding Advances, Employee shall immediately remit the shortfall to the Company; provided, however, that during the first eight (8) months of the Term following the Effective Date, the Company shall waive the immediate payment of such shortfall to the Company if, in its reasonable judgment, there are sufficient uncollected receivables generated by Employee that are less than 120 days old and that, if collected, would support the payment of such Commission in future Periods; provided, further, that in such event, the amount of the shortfall will be counted as part of the Outstanding Advances for the next Measurement Period.

(c)  Employee's Commission in respect of any Measurement Period shall be equal to twenty percent (20%) of the "Gross Profit" (as defined below) actually received by the Company

that is generated by those customers called upon by Employee in the performance of his duties hereunder (the "Customers"); provided, however, that the foregoing commission percentage may be adjusted as to specific Customers upon the mutual written agreement of Employee and the Company. The Commission will be computed based upon invoices that actually have been paid to the Company by Customers within one hundred twenty (120) days of the date of each such invoice; provided, however, that a paid invoice shall count only once toward the computation of any Commission, and provided, further, that any invoice that is not paid within one hundred twenty (120) days of its invoice date shall not be counted toward the calculation or payment of any Commission, even if subsequently paid. The Company will use its reasonable efforts to notify Employee of any unpaid invoices that are more than ninety (90) days old.

(d)     In the event this Agreement expires or is terminated, Employee shall be entitled to be paid Commission in respect of any Customer order that has been entered into the Company's system and identified as an order generated by Employee as of the Termination Date and which is paid within 120 days of the invoice date thereof; provided, however, such Commission shall be payable not later than 180 days after the Termination Date, and provided, further, that such payment shall be subject to set-off in the event that Employee has amounts due and owing to the Company (e.g., Advances that have been made in respect of Commissions that were not earned).

(e)     For purposes of this Agreement, and with respect to any given Customer, "Gross Profit" means the gross revenues to the Company directly attributable to those revenues received from such Customer less the expenses of the Company attributable to such Customer, all as reasonably determined by the Company.

## Exhibit B

### Benefits

- Basic medical plan -- Employee will be responsible for 25% of the premiums and expenses associated with the Company's basic medical plan, plus any increases in such expenses in the future. If such a plan is offered, Employee may select a medical plan that is more comprehensive than the basic plan, but shall bear any additional expense over and above those described by the preceding sentence.

- 401(k) plan

- Mobile phone (with a monthly charge limit of $ 100.00 )

- Business cards, promotional materials, catalogs, basic office supplies

ATLANTA:4481997.4

## Schedule 5(b)

### Separation Payment

If payable, the Separation Payment shall be an amount equal to (a) Employee's average weekly Commission for the most recently ended Measurement Period from the Termination Date, multiplied by (b) four (4) (the "Separation Payment Sum"). If payable, the Separation Payment Sum shall be paid to Employee in one lump sum no later than fifteen (15) days after the Termination Date, but shall be subject to set-off in the event that Employee has amounts due and owing to the Company (e.g., Advances that have been made in respect of Commissions that were not earned).

ATLANTA:4481997.4